Opinion
issued January 27, 2011   

 

 

 

 

 

 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-09-00708-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MAC HAIK CHEVROLET LTD. AND WELLS FARGO
AUTO FINANCE, INC., Appellants

 

V.

 

ALYSHA B. DIAZ AND MIGUEL DIAZ, Appellees

 

 



On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 2008-21787

 

 



MEMORANDUM
OPINION

Appellants, Mac Haik Chevrolet Ltd. (“Mac
Haik”) and Wells Fargo Auto Finance, Inc. (“Wells Fargo”), challenge the trial
court’s judgment, entered after a jury trial, in favor of appellees, Alysha B.
Diaz and Miguel Diaz, in the Diazes’ suit against Mac Haik and Wells Fargo[1]
for violations of the of the Texas Deceptive Trade Practices and Consumer
Protection Act (“DTPA”)[2]
and breach of express warranties.[3]  In seven issues, Mac Haik and Wells Fargo
contend that the Diazes’ DTPA claims regarding their purchase of a used 2003 Chevrolet
Tahoe from Mac Haik are barred by “as is” language contained in a Buyer’s Guide
that they received when they purchased their Tahoe, the evidence is legally and
factually insufficient to show that Mac Haik owed any duty to the Diazes or
that Mac Haik violated the DTPA, the evidence is legally and factually
insufficient to support the jury’s finding that the Diazes “justifiably revoked
acceptance” of the Tahoe, the trial court erred in denying their motion to
exclude the Diazes’ expert testimony, the Diazes’ “motion for entry of judgment
on the jury’s verdict” waived the Diazes’ right to subsequently request a
higher amount of attorney’s fees than the amount awarded by the jury, and the
Diazes “waived all claims they might have asserted against Wells Fargo by
failing to submit any issues to the jury concerning Wells Fargo.”  

We affirm.

Background

          In
their original petition, the Diazes alleged that in the summer of 2007, they
were in the market for a used Chevrolet Tahoe and found an online listing for a
“low-mileage” 2003 Tahoe at a Mac Haik dealership in Houston.  On July 28, 2007, the Diazes traveled from
their small town, which is several hours from Houston, to Mac Haik, where they met
with Alejandro Flores, a salesman, who told them that the Tahoe was “low-mileage”
and had approximately 36,000 miles on it. 
The Diazes purchased the Tahoe, and the purchase order stated that the
Tahoe had 36,578 miles on it.  Shortly
after purchasing the Tahoe, the Diazes noticed a wire underneath the steering
wheel.  The Diazes later discovered that,
attached to this wire, there was a switch that caused the Tahoe’s speedometer
and odometer to stop functioning. On December 5, 2007, the Diazes returned the
Tahoe to Mac Haik and complained about the existence of the switch.  

Following unsuccessful negotiations
with Mac Haik, the Diazes filed suit, alleging that Mac Haik had violated the
DTPA by misrepresenting the characteristics and quality of the Tahoe.  The Diazes further alleged that Mac Haik
breached express warranties and they were entitled to revoke acceptance of the
Tahoe.   Mac Haik and Wells Fargo filed
general denials.  

At trial, Alysha Diaz testified that
she became interested in the Tahoe based upon Mac Haik’s online advertisement,
which stated that the Tahoe had “low mileage,” it was a “GM certified” Tahoe,
and it came with a warranty.  The Diazes
introduced into evidence the online advertisement, which represented that the
Tahoe had 36,816 miles on it.  Alysha noted
that on July 28, 2007, she and her husband visited Mac Haik and met Flores, who
told them that they would not find another 2003 Tahoe with “that low of
mileage.”  After a test-drive, the Diazes
purchased the Tahoe.    

The purchase order, which the Diazes introduced
into evidence, represented that the Tahoe had 36,578 miles on it, and Alysha
and her husband had understood that this represented “the actual mileage” on
the Tahoe.  The purchase order also
referenced a warranty, for which the Diazes had separately paid approximately
$2,000.  It also included a separate box,
entitled “Disclaimer of Warranties,”  which
was set off with bold, larger-type, and all capital letters.  Although it contained a signature block for
the “Buyer’s signature,” the Diazes did not sign the signature block.[4]  The Diazes only signed the signature block at
the bottom of the purchase order.  Above
this  block  there was a paragraph providing that there
were “no other warranties, either
express or including any implied warranty of merchantability or fitness” and,
with the sale of used cars, the dealer “assumes only such warranty obligations
to Buyer as are set forth on the face of
this order or in a separate written
instrument, if any.”  (Emphasis
added.)

          The
Retail Installment Contract and the warranty documents, which the Diazes also
introduced into evidence,[5]
provided that the Diazes had purchased a 24 month/24,000 mile extended warranty.  The Diazes also introduced into evidence the
Odometer Disclosure Statements signed by a Mac Haik representative and the
Diazes, which represented that on the date of sale the Tahoe had 36,578 miles
on it.  Finally, the Diazes introduced
into evidence a copy of the “GM Certified Used Vehicles Inspection Checklist,”
which accompanied their newly-purchased Tahoe and represented that a GM
mechanical inspector had performed a “final inspection” on the Tahoe and determined
that the Tahoe met the “certified” standards checked on the list.  This certification form also stated that the Tahoe
had 36,578 miles on it and contained an extensive checklist of items that Mac
Haik represented as having been inspected by its employees and as having met
the GM certified standards.  One of the
items checked by the Mac Haik inspector as “meets std.”on the checklist was
“speedometer/odometer (operational).”

          Alysha
explained that approximately “a few weeks” after they had purchased the Tahoe, they
noticed “some kind of a loose wire hanging down” “kind of back by the brake
pedal.”  She “guessed” that she had not
previously noticed this wire because it had been “more hidden,” and, at that
time, she “had no idea what” the wire was.” 
However, because the wire “wasn’t causing any problems,” she did nothing
further.  “A while later,” the Diazes
“started noticing” problems with the speedometer, they became more concerned,
and then contacted a Mac Haik salesman, who mentioned a recall related to the
speedometer.  “A little bit after that,”
the Diazes noticed that the speedometer problems were “more sporadic” and it
was reflecting incorrect speeds.  Sometime
around November 2007, Alysha asked Miguel to take a closer look at the
Tahoe.  When he more closely inspected
the loose wire, he noticed that attached to it was “some kind of a little
switch” and, if one pushed the switch, the speedometer would “drop all the way
to zero” while  the Tahoe was being
driven.  The Diazes then contacted a mechanic
who was also a friend, who stated that the device “could be possibly connected
to the odometer.”  The Diazes then
pressed the switch and confirmed that, when pressed, the odometer did not
record mileage.  The Diazes visited
another mechanic, who told them not to touch the switch, the switch was
illegal, and they should contact a lawyer. 
The Diazes became “furious” because their “whole purpose” in buying the
Tahoe was for its “low mileage” and they had learned that the switch prevented
the mileage from being accurately recorded.

          The
Diazes returned to Mac Haik shortly thereafter in early December 2007,  and, when they informed Mac Haik about the wire
and switch, it attempted to sell the Diazes a more expensive Tahoe with higher
mileage and offered to accept as a trade-in the Tahoe with the switch.  The Diazes ultimately refused Mac Haik’s
offer and instead instructed it to “fix” their Tahoe.  Leaving their Tahoe for repairs, the Diazes
left Mac Haik in a rental car.  When they
later returned to Mac Haik, they discovered that it had not fixed the
switch.  The Diazes then retrieved their
Tahoe and contacted a lawyer.  Alysha
confirmed that, if they had known about the existence of the switch, they would
not have purchased the Tahoe because there was no “way of knowing the true
mileage.”

          Alysha
denied that either she, Miguel, or anyone else had installed the switch on the
Tahoe after their purchase.  On
cross-examination, she agreed that she and her husband looked at the Tahoe
prior to the purchase and they did not arrange for an independent mechanic to inspect
the Tahoe prior to their purchase. 
However, she noted that Mac Haik had represented that it had inspected
the Tahoe, and she emphasized that she had “a GM certified paper that shows it
should have been inspected.” Alysha explained that, at this point, she and her
husband simply wanted to “unwind the entire deal” because they never would have
bought the Tahoe had they known about the existence of the switch.

Miguel Diaz also testified that he
and his wife went to see the Tahoe at Mac Haik because it had “low mileage” and
the Mac Haik salesman informed them that they would not find another Tahoe
“with that low of a mileage [on] that year model.”  Miguel stated that approximately two weeks
after their purchase, they noticed, hanging underneath the dashboard, the wire,
which they had not noticed on the date of purchase.  Miguel thought nothing of the wire because
nothing was wrong with the Tahoe.  Subsequently,
the speedometer started vibrating and then started “acting crazy,” going from
“zero to a hundred” when the Tahoe was being driven.  In late November 2007, Miguel looked at the
wire again, saw a “loop,” and “[f]rom that loop it was connected to a
switch.”  Miguel flipped the switch to
see what it would do, and it made the speedometer go to zero.  Miguel then called a friend, who suggested
that the switch could be connected to the odometer.  Miguel pressed the switch again and learned that
the odometer did not register mileage when the switch was pressed.  Miguel took the Tahoe to another mechanic,
who told him that such a switch is illegal. 
Miguel explained that “because of the switch being how heavy it was,” he
assumed that “all of that bouncing” while driving had pulled the wire down until
the wire and switch became visible.

          The
Diazes returned to Mac Haik and asked for a refund or a different Tahoe.  The Mac Haik salesman “made it sound like
[the Diazes] had installed” the switch, and Miguel denied that he or anyone
else had installed the device after he and his wife had purchased the Tahoe.  On cross-examination, Miguel agreed that once
he saw the switch during his examination, he had pulled it down because it was
still “hidden.”

          Alejandro
Flores, a Mac Haik salesman, testified that another customer had traded in the
Tahoe that was ultimately purchased by the Diazes.  When this other customer brought in the Tahoe
for the trade-in, Flores had walked around the Tahoe, looked inside, opened the
driver’s door, stuck his head underneath the dash, and looked for a switch
connected to the odometer.  Flores explained
that he did this because this Tahoe had low mileage, and he “check[s] out the
vehicles with low miles.”  Flores also
put his hand “underneath [the dashboard] because obviously someone who has a
switch in there will try to hide it.” Flores was familiar with these kinds of
switches because he had a friend in high school with one.

          Flores
noted that on December 7, 2007, the Diazes returned to Mac Haik and told him
that they had discovered the switch in the Tahoe.  Flores looked at the switch, and he told them
that the switch was not in the Tahoe at the time of their purchase.  He explained that the Diazes were
“frustrated” and their reaction was consistent with someone who was surprised
to find the switch in their vehicle.  Flores
explained that he did not accuse the Diazes of having installed the switch and
it was Mac Haik’s general practice to send any vehicle that it discovered with such
a switch “to the auction.”

          Mac
Haik service director Brian Caldwell testified that “a GM certified inspection,”
like the one purportedly performed on the Diazes’ Tahoe, is “more detailed than
a standard inspection” and the benefit of such an inspection is “warranty
coverage[].”  He explained that a vehicle
that is not “certified” would be “more than likely sent to be wholesaled.”  Although Caldwell contended that an
inspection would have uncovered a switch attached to the odometer, he, on cross
examination, agreed that he did not work at Mac Haik until January 2008, he had
no personal knowledge of the inspection conducted on the Diazes’ Tahoe, he could
not identify the signature on the GM certified inspection form in question, the
signature on the form was illegible, and he was not aware of anyone at Mac Haik
who was familiar with the actual inspection performed on the Diazes’ Tahoe.  Caldwell also agreed that other portions of
the GM certified inspection form for the Diazes’ Tahoe were filled out
incorrectly or incompletely.  He also
agreed that an “appearance inspector” had not signed the form in the space
required.  

          Owen
McCumber, Mac Haik’s general manager, testified that his “position” was that
the switch “was not on the vehicle at the time of sale.”  However, he agreed that he had not met the
Diazes and Mac Haik had not inspected the Tahoe, despite being given the
opportunity to do so.  

          At
the conclusion of trial, the parties stipulated on the record that if the jury
answered “Yes” as to whether the Diazes justifiably revoked acceptance of the
Tahoe, and if the Diazes were allowed to recover “so much of the price as has
been paid,” then the appropriate sum of damages to be awarded the Diazes would
be $8,795.95.

          The
jury, in response to question one, found that Mac Haik had engaged in false,
misleading, or deceptive acts or practices that the Diazes had relied on to
their detriment and such acts or practices were a producing cause of damages to
the Diazes.[6]   In response to question two, it found that
these acts or practices had “led to the acquisition of . . . money or property
from” the Diazes.[7]  In response to question three, it found that
Mac Haik had “fail[ed] to comply with an express warranty” provided to the
Diazes.  In response to question four,
which was predicated upon an affirmative answer to any of the first three
questions, it found that the Diazes had sustained economic damages in the
amount of $7,550.  In response to
question five, the jury found that the Diazes had “justifiably revoked acceptance”
of the Tahoe.[8]  In response to question six, which was
predicated on a “yes” answer to either question four or five,”[9] it
found that the Diazes should be awarded reasonable attorney’s fees of $22,000
for trial, $2,000 for an appeal to the court of appeals, and $2,000 for an
appeal to the supreme court.[10]

          Mac
Haik  filed a motion for judgment
notwithstanding the verdict, and the Diazes filed a “motion to enter judgment,”
in which they asked the trial court to enter judgment on the jury’s findings in
response to questions one, two, three, and five and to award “restoration of
$8,795.95, a sum which was subject to stipulation at trial, in exchange for
return of the Tahoe.”  Also within their
motion, the Diazes asked the trial court to disregard the jury’s findings on
attorney’s fees, contending that the evidence conclusively established $33,000
in attorney’s fees for trial, $6,000 in attorney’s fees for an appeal to the
court of appeals, and $6,000 in attorney’s fees for an appeal the supreme court.   The
Diazes also included in their motion a paragraph requesting entry of judgment
against Wells Fargo.  In this paragraph,
the Diazes contended that Wells Fargo was liable for their damages because the
Diazes had “made payments to [Wells Fargo]” and exhibits admitted into evidence
showed that Wells Fargo was an assignee of Mac Haik.  The Diazes contended that, as an assignee,
Wells Fargo “was entitled to receive payments” and “also was liable for the
wrongs” of Mac Haik. 

The trial court rendered judgment in
favor of the Diazes and against Mac Haik and Wells Fargo “cancelling the
purchase agreement between the parties and restoring [the Diazes] the sum of
$8,795.95.”  The trial court concluded
that the jury’s findings on attorney’s fees were “contrary to all of the
evidence presented at trial,” and it awarded the Diazes $33,000 in attorney’s
fees for trial, $6,000 for an appeal to the court of appeals, and $6,000 for an
appeal to the supreme court.

Legal and Factual Sufficiency

In their first issue, Mac Haik and
Wells Fargo argue that the Diazes’ DTPA claims are barred because the Buyer’s
Guide contained “as is” language, Mac Haik “gave no assurances, express or
implied,” and the Diazes failed to offer proof of misrepresentations,
concealment, or “impairment of inspection.” 
Mac Haik and Wells Fargo assert that there is “no credible evidence”
that its mileage statements were false.  In
their second and third issues, Mak Haik and Wells Fargo argue that the evidence
is legally and factually insufficient to support the jury’s DTPA findings
because Mac Haik did not owe a duty to the Diazes to disclose unknown defects
or defects about which “it should have known,” the Diazes failed to “offer any
credible evidence” contradicting the mileage reading on the odometer, Mac Haik
did not have “a fiduciary relationship” with the Diazes, Mac Haik “had no legal
duty to inspect the odometer,” and Mac Haik’s “failure to inspect the odometer
is not a wrongful act in violation of the DTPA.”  In their fifth issue, Mac Haik and Wells Fargo
argue that the evidence is legally and factually insufficient to support the
jury’s finding, in response to question five, that the Diazes “justifiably
revoked acceptance” of the Tahoe because the Diazes “accepted the goods, never
revoked acceptance, and did not assert a breach of contract claim.”

We will sustain a legal sufficiency
or “no-evidence” challenge if the record shows one of the following: (1) a
complete absence of evidence of a vital fact, (2) rules of law or evidence bar
the court from giving weight to the only evidence offered to prove a vital
fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the
vital fact.  City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005).  In conducting a legal sufficiency review, a
“court must consider evidence in the light most favorable to the verdict, and
indulge every reasonable inference that would support it.”  Id.
at 822.  If there is more than a
scintilla of evidence to support the challenged finding, we must uphold it.  Formosa
Plastics Corp. USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d
41, 48 (Tex.1998).  “‘[W]hen the evidence
offered to prove a vital fact is so weak as to do no more than create a mere
surmise or suspicion of its existence, the evidence is no more than a scintilla
and, in legal effect, is no evidence.’”  Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 601 (Tex. 2004) (quoting Kindred v.
Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).  However, if the evidence at trial would enable
reasonable and fair-minded people to differ in their conclusions, then jurors
must be allowed to do so. Keller, 168
S.W.3d at 822; see also King Ranch, Inc.
v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003).  “A reviewing court cannot substitute its
judgment for that of the trier-of-fact, so long as the evidence falls within
this zone of reasonable disagreement.”  Keller, 168 S.W.3d at 822.

In conducting a factual sufficiency
review, we must consider, weigh, and examine all of the evidence that supports
or contradicts the jury’s determination. Plas-Tex,
Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); London v. London, 192 S.W.3d 6, 14–15
(Tex. App.—Houston [14th Dist.] 2005, pet. denied).  We may set aside the verdict only if the
evidence that supports the jury’s finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong or unjust.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex.1986); Nip
v. Checkpoint Sys., Inc., 154 S.W.3d 767, 769 (Tex. App.—Houston [14th
Dist.] 2004, no pet.).

Here, the jury found that Mac Haik
had engaged in false, misleading, or deceptive acts or practices that the
Diazes had relied on to their detriment and that such acts or practices were a
producing cause of damages to the Diazes.  See Tex.
Bus. & Com. Code Ann. § 17.46(a) (Vernon Supp. 2010).  It also found that these acts or practices
had “led to the acquisition of any money or property from” the Diazes.  See id. § 17.50(b)(3) (Vernon Supp.
2010).[11]  The charge defined “[f]alse, misleading, or
deceptive act[s] or practice[s]” to mean “(a) [r]epresenting that a 2003
Chevrolet Tahoe had or would have characteristics that it did not have,” and
“(b) [r]epresenting that a 2003 Chevrolet Tahoe is or will be of a particular
quality if it was of another.”  See Tex.
Bus. & Com. Code Ann. § 17.46(b)(5) (Vernon Supp. 2010)
(characteristics), § 17.46(b)(7) (quality). 
The jury also found that Mak Haik had “fail[ed] to comply with an
express warranty” provided to the Diazes. 
The charge defined an express warranty as “any affirmation of fact or
promise made by one of the defendants identified below [that] becomes part of
the basis of the bargain.  It is not
necessary that formal words such as ‘warrant’ or ‘guarantee’ be used or that
there be a specific intent to make a warranty.”

The Diazes both testified that Mac
Haik represented the Tahoe as “low-mileage” in advertisements, a Mac Haik
salesman represented that it was a “low-mileage” Tahoe, Mac Haik identified the
mileage in the purchase order and in multiple other documents that it provided the
Diazes, Mac Haik marketed and sold the Tahoe as a “GM certified vehicle,” Mac’s
Haik’s certification of the Tahoe represented that its employees had conducted
inspections of the Tahoe and had  met GM
certified standards, and the Diazes purchased the Tahoe because Mac Haik told
them it had “low-mileage,” Mac Haik certified it as meeting GM certified standards,
and they could purchase a warranty for the Tahoe.  The Diazes further testified that they
discovered a loose wire shortly after purchase, they made a closer examination
of the wire when the Tahoe developed speedometer problems, they discovered a
switch that had been “hidden” underneath the dashboard, they learned that the
switch prevented the recording of mileage and resulted in an inaccurate
odometer reading, and they raised their complaint with Mac Haik, who denied
responsibility.     

In contrast, Flores, the Mac Haik
salesman, testified that he specifically looked for such a switch and did not
find one at the time another customer traded in the Tahoe, and other Mac Haik
witnesses testified that any such switch should have been discovered during inspections.   However, no one at Mac Haik could testify as
to the actual inspection performed on the Tahoe.  And, as the Diazes emphasized, certain
portions of the certified inspection form for the Tahoe were not properly completed,
indicating a flawed inspection process.  

Although the parties presented conflicting
evidence, we conclude that the evidence is legally and factually sufficient to
support the jury’s implied finding that had Mac Haik performed an inspection of
the Tahoe, as represented to the Diazes, it would have discovered the wire, the
switch, and the malfunctioning odometer. 
We further conclude that the evidence is legally and factually
sufficient to support the jury’s implied finding that the wire and illegal
switch device existed at the time Mac Haik marketed and sold the Tahoe as a GM
certified vehicle.   Mac Haik employees testified that, in order to
classify a vehicle as a GM certified vehicle, such a vehicle must undergo more
rigorous inspections. It was undisputed that the Diazes purchased the Tahoe
based upon the certified status.  Accordingly,
we hold that the evidence is legally and factually sufficient to support the
jury’s findings that Mac Haik engaged in false, misleading, or deceptive acts
or practices by representing that the Tahoe had characteristics that it did not
have and that it was of a particular quality when it was not.[12]  

Related to their more direct
sufficiency complaints, Mac Haik and Wells Fargo assert that the Diazes’ claims
are barred by “as-is” language in a Buyer’s Guide.   Mac Haik and Wells Fargo, for the first time
on appeal, and in contradiction to the testimony of their own trial witnesses,
also assert that Mac Haik had no obligation to even inspect the Tahoe. As with their
sufficiency arguments, Mac Haik and Wells Fargo’s “as-is” and “no duty”
arguments ignore the conflicting evidence in the record.  In regard to the “as-is” defense, Mac Haik and
Wells Fargo wholly fail to acknowledge the discrepancies in the documentary
evidence.  For example, the Buyer’s Guide
contains two boxes that could have been checked: the first is entitled, “AS-IS
NO WARRANTY,” and it is checked, while the second is entitled, “WARRANTY,” and
it is not checked.   The face of this
document establishes that either one or the other box should have been
checked.  Here, the “AS-IS NO WARRANTY
BOX” is checked, even though the evidence at trial conclusively established
that the Diazes purchased and received a warranty on the Tahoe.  At trial, it was undisputed that Mac Haik had
performed warranty work on the Tahoe that was unrelated to the switch.   Another obvious discrepancy arises from the
face of the purchase order.  The Diazes
did not sign the Disclaimer of Warranties box that appears on the purchase
order.  None of these discrepancies were
addressed in any great detail at trial because Mac Haik and Wells Fargo did not
as forcefully assert their “as-is” argument below.  Based upon all of these discrepancies in the
record, we conclude that Mac Haik and Wells Fargo have not established as a
matter of law that the “as-is” clause in the Buyer’s Guide bars the Diazes’
claims or renders the evidence legally or factually insufficient to support the
jury’s liability findings.

 
In regard to their duty argument, Mac Haik and Wells Fargo fail to
address the undisputed evidence that a GM certified vehicle must undergo certain
inspections and that certain items, including the odometer, must meet GM
standards.  Mac Haik employees testified
as to the benefits of this certification status and explained that higher
inspection standards are applied to GM certified vehicles. Although we do not
suggest that the record before us establishes that the certification process necessarily
creates a warranty for every item identified in the checklist, it renders Mac
Haik and Wells Fargo’s no duty argument frivolous.    

In regard to Mac Haik and Wells
Fargo’s challenge of the sufficiency of the evidence supporting the jury’s
finding on question number five, we note that the question provided a separate
basis for a finding of liability.  We
have already held that the jury’s DTPA findings are supported by legally and
factually sufficient evidence. 
Accordingly, we hold that to the extent there was any error associated
with the jury’s finding on the revocation question, which we need not decide,
such error was rendered harmless.

We overrule Mac Haik and Wells
Fargo’s first, second, third, and fifth issues.[13]

Expert Testimony

In their fourth issue, Mac Haik and
Wells Fargo argue that the trial court erred in denying their motion to exclude
the testimony of Robert Eppes, the Diazes’ expert, because he was not qualified
to provide certain opinions and some of his opinions were “speculative,
unscientific, conclusory, and based on a unreliable and flawed foundation.”  Mac Haik and Wells Fargo assert that (1)
Eppes was not qualified to opine that the switch in question was present when
the Diazes purchased the Tahoe and that “a reasonable inspection by Mac Haik
would have disclosed the presence” of the switch; (2) Eppes’s opinions that the
switch functioned to turn off the odometer and “a reasonable inspection by Mac
Haik would have disclosed the presence” of the switch were “speculative,
unscientific, conclusory, and based on  unreliable
and flawed foundation”; and (3) Eppes’s opinions that the switch was present
when the Diazes purchased the Tahoe, the switch functioned to turn off the
odometer, “a reasonable inspection by Mac Haik would have disclosed the
presence” of the switch, the Diazes’ Tahoe had 80,000 to 90,000 miles on it, and
the fair market value of the Tahoe was $9,000 were “based on unreliable and
flawed foundational data.”  

An expert witness may testify
regarding scientific, technical, or other specialized matters if the expert is
qualified, the expert’s opinion is relevant, the opinion is reliable, and the
opinion is based on a reliable foundation.  See Tex. R. Evid. 702; Whirlpool Corp. v. Camacho, 298 S.W.3d 631, 637 (Tex. 2009).  A two-part test governs the admissibility of expert
testimony: (1) the expert must be qualified and (2) the testimony must be
relevant and based on a reliable foundation.  Helena
Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 2001); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556
(Tex. 1995).  A trial court makes the
initial determination about whether an expert and the proffered testimony meet
these requirements.  Helena Chem. Co., 47 S.W.3d at 499.  The trial court has broad discretion to
determine admissibility, and an appellate court will reverse only for an abuse
of that discretion.[14]  Id.

In examining the qualifications of an
expert, trial courts “must ensure that those who purport to be experts truly
have expertise concerning the actual subject about which they are offering an
opinion.”  Id. (citing Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998)).  In deciding reliability, the trial court must
“evaluate the methods, analysis, and principles relied upon in reaching the
opinion” and “should ensure that the opinion comports with applicable
professional standards outside the courtroom and [has] a reliable basis in the
knowledge and experience of the discipline.” 
Id. (citing Gammill, 972 S.W.2d at 725–26).

In Robinson, the Texas Supreme Court identified six nonexclusive
factors to consider in determining the reliability of an expert’s testimony: (1)
the extent to which the theory has been or can be tested; (2) the extent to
which the technique used by the expert relies upon the subjective interpretation
of the expert, (3) whether the theory has been subjected to peer review or
publication; (4) the potential rate of error; (5) whether the underlying theory
or technique has been generally accepted as valid by the relevant scientific
community; and (6) the non-judicial uses of the theory or technique.  Robinson,
923 S.W.2d at 557.     

These factors may not apply to
certain testimony, and, in such instances, “there still must be some basis for
the opinion offered to show its reliability, and, ultimately, the trial court
must determine how to assess reliability.” Helena
Chem. Co., 47 S.W.3d at 499 (citing Gammill,
972 S.W.2d at 726); see also Whirlpool
Corp, 298 S.W.3d at 638 (explaining that in determining whether expert testimony is reliable
court may consider Robinson factors and
expert’s experience and that “in very few cases will the evidence be such that
the trial court’s reliability determination can properly be based only expert’s
experience to the exclusion of Robinson
factors” or, “on the other hand, properly be based only” on Robinson factors such to exclusion of
considerations based on expert’s experience).  “If an expert relies upon unreliable
foundational data, any opinion drawn from that data is likewise unreliable.”  Helena
Chem. Co., 47 S.W.3d at 499.

If the trial court determines that
the proffered testimony is relevant and reliable, it must then determine
whether to exclude the evidence because its probative value is outweighed by
the “danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of
cumulative evidence.”  Robinson, 923 S.W.2d at 557 (citing Tex. R. Evid. 403).

          Here,
we note that the objections of Mac Haik and Wells Fargo in their motion to
exclude Eppes’s testimony were much more limited than the complaints now made
on appeal.  Mac Haik and Wells Fargo made
no additional objections to Eppes’s testimony during trial.  Accordingly, we will consider only those
challenges raised by Mac Haik and Wells Fargo in their motion to exclude
Eppes’s testimony that are consistent with those Mac Haik and Wells Fargo now
assert on appeal. [15]  See
Nissan Motor Co. Ltd. v. Armstrong, 145 S.W.3d 131, 143–44 (Tex. 2004) (holding
that challenge to expert’s qualifications, which was not presented in pretrial
motion to exclude, was not preserved for appeal).  In their motion to exclude, Mac Haik and
Wells Fargo challenged any testimony offered by Eppes that (1) the switch
device was present in the Tahoe when Mac Haik sold it to the Diazes, (2) a
reasonable inspection by Mac Haik would have uncovered the existence of the
switch, and (3) the switch was or may have been “tucked under the dash” when
the Diazes purchased the Tahoe.  Mac Haik
and Wells Fargo complain on appeal about the admission of testimony concerning
the first two categories.[16]

          Eppes
testified that he is a certified personal property appraiser and consultant in
automotive fraud cases, one of his specialty areas is odometer fraud, and, in
this capacity, he inspects and researches motor vehicles.  He has been an automotive fraud consultant
since 2005, had previously served as an expert witness in two automotive fraud
cases, and had been retained as an expert in automotive fraud cases sixty times.  Eppes has been a member of the National
Odometer and Title Fraud Enforcement Association and the Midwest Odometer Title
Fraud Enforcement Association for twenty-four years, and these organizations
provide annual training of approximately forty hours.  He reviews trade magazines, publications, and
bulletins issued by manufacturers concerning odometers, and he has had twenty
years of continuing education in the field. 
Prior to becoming a consultant, Eppes, for twenty-one years, was a
special agent with the National Highway Traffic Safety Administration (“NHTSA”),
where he worked in the odometer fraud unit and his responsibilities were to
conduct odometer fraud investigations.  One
of four agents in the United States trained to conduct such investigations, Eppes
conducted approximately 560 odometer fraud investigations, attended conferences
and training on odometer fraud, and, serving as a trainer on odometer fraud for
law enforcement personnel, taught such topics as the techniques of committing
odometer fraud and the installation of switches to commit odometer fraud.  Eppes previously served as an expert witness
in twenty five criminal proceedings involving odometer fraud.

Eppes explained that he inspected the
Diazes’ Tahoe in December 2008 and noticed “telltale signs” of a vehicle that had
more mileage than shown on its odometer. 
He tested the switch and discovered that the odometer, when pressed a
certain way, did not properly record mileage. 
He then examined the wires from the switch and observed that they went
to the “instrument cluster” and were connected to the “vehicle speed sensor.”  After the Diazes introduced multiple pictures
into evidence, Eppes opined that the switch had been installed to turn off the
odometer so that the Tahoe would “show less than the actual miles the vehicle [had]
traveled.”  He stated that he had seen
this kind of switch on forty to fifty prior occasions and opined that a dealer
performing a “reasonable inspection” would have discovered the switch.  He based his opinion, in part, on the
condition of the Tahoe and the scope of inspection necessary to find such a
switch.  Eppes explained that “It
wouldn’t take much to find this if it were there.”  He also testified regarding general inspection
practices in the industry, which he believed should have led to the discovery
of such a switch.

Eppes, based on his experience, also
noticed issues with the brake pedal on the Tahoe that indicated to him that
someone may have replaced it, which indicated “someone wanting to disguise the
mileage on the vehicle.”  Based upon his
experience regarding the purposes of the switches, Eppes opined that “if the
switch was on the vehicle on the date of the sale to the Diazes,” the odometer
would not have been accurate.   He explained, “[T]here’s only one purpose to
put a switch onto the vehicle speed sensor,” which is to preclude the recording
of mileage on an odometer.

In regard to the first challenged
opinion, the record reflects that Eppes did opine on two occasions during his
extensive testimony that the switch was on the Tahoe at the time of the Diazes’
purchase.   Eppes based his opinion, in
part, on the condition of the Tahoe and other “telltale” signs, which indicated
to him that the Tahoe had been sold to the Diazes with more mileage on it than the
amount disclosed.  Although Mac Haik did,
during its cross-examination of Eppes, elicit that he did not have personal
knowledge of the number of miles driven by the Diazes during the time that they
had the Tahoe, the Diazes presented evidence indicating that that the amount of
actual miles on the Tahoe, as estimated by Eppes, exceeded the amount of miles that
would have accumulated from their personal driving.  Also, we note that even though Eppes did opine
on two occasions about the existence of the switch, it was clear from his
testimony that he conceded to the jury that he had no personal knowledge of the
condition of the Tahoe on the date of purchase. 
In fact, the Diazes’ trial counsel even conditioned some of his direct questioning
to Eppes by asking him to assume that the switch was on the Tahoe at the time
of purchase.

Substantial evidence supports the
trial court’s implied finding that Eppes was qualified to opine on the
existence of the switch on the Tahoe at the time the Diazes purchased it and,
based upon his extensive experience and training in the field of odometer
fraud, his opinions were reliable. 
Accordingly, we hold that the trial court did not abuse its discretion
in admitting this testimony. 
Alternatively, even if the trial court erred in admitting this portion
of Eppes’s testimony, any error would be harmless based upon the limitations
that Eppes himself placed upon his own testimony, the limitations of such
testimony suggested by the questioning of the Diazes’ trial counsel, and the
other evidence presented by the Diazes regarding the existence of the switch at
the time of the purchase.

In regard to the second challenged
opinion that a reasonable inspection would have uncovered the switch, it is
clear from Eppes’s extensive training and experience as an investigator of
odometer fraud that he was very familiar with the installation and location of
the type of switch discovered on the Diazes’ Tahoe.  Eppes testified that during his career as an
odometer fraud investigator, he had seen approximately fifty of these types of
switches on other vehicles.  Eppes also
testified about the extensive training he had received in connection with being
an odometer fraud investigator, and he explained that, as one of four special
agents in the NHTSA assigned to the field of odometer fraud, he had served as a
trainer at education courses regarding odometer fraud.  Accordingly, we hold that the trial court did
not abuse its discretion in concluding that Eppes was qualified and possessed
the requisite experience to testify that a reasonable inspection of the Tahoe
would have uncovered the existence of the switch, even if it was “hidden” at
the time of purchase.  

In regard to the reliability
challenge, the trial court could have reasonably concluded that Eppes’s
experience in investigating odometer fraud, and his specific experience in
discovering these types of switches on a large number of vehicles, provided a
sound basis for his opinion that a reasonable inspection of a vehicle, and its
odometer, would have uncovered the existence of the switch.  Eppes noted that Mac Haik documents revealed
that Mac Haik was required to have specifically performed an inspection on the
odometer in order for it to market the Tahoe as a GM certified vehicle. His
testimony that a reasonable inspection should have uncovered the existence of
the switch was also based, in part, on what he explained were “telltale signs”
of a vehicle that had been driven more miles than the amount indicated on its odometer.  Eppes explained that persons in the industry
would use these “telltale signs” to make further inquiry into issues concerning
the odometer and such signs were present in regard to the Tahoe’s odometer and
would have warranted a more rigorous inspection.  Again, Mac Haik notes that, during
cross-examination, Eppes admitted that he was not familiar with the Diazes’
driving habits after they had purchased the Tahoe.  However, even if Eppes’s reliance on the
estimated mileage was somehow flawed, the reliability of his opinion about the
scope of a reasonable inspection is still supported through his other
testimony.  

Finally, we note that Mac Haik and
Wells Fargo’s primary theory at trial was that Mac Haik conducted a reasonable
inspection of the Tahoe and the switch did not exist at the time of the Diazes’
purchase.  Thus, Mac Haik and Wells Fargo’s
trial position was that the switch was added by the Diazes, or some unknown
third party, after the purchase.  Mac
Haik never seriously challenged the proposition that a reasonable inspection
should have uncovered the existence of the switch.  Flores’s testimony also supports Eppes’s
testimony that because of the low-mileage on the Tahoe at the time it was traded
in, there was more reason to inspect it for the existence of a switch.  Flores explained that when the original owner
of the Tahoe brought it in for a trade, he specifically stuck his head
underneath the dash and looked for a switch connected to the odometer because
of the year of the Tahoe and its low mileage. 
Flores also put his hand “underneath because obviously someone who has a
switch in there will try to hide it.”  

In sum, we hold that the trial court
did not abuse its discretion in determining that Eppes was qualified to offer
the challenged expert opinions or that his opinions were reliable.

We overrule Mac Haik and Wells
Fargo’s fourth issue.

Motion for Entry of Judgment

In their sixth issue, Mac Haik and
Wells Fargo argue that the Diazes’ “motion for entry of judgment on the jury’s
verdict” and the trial court’s granting of this motion waived the Diazes’ right
to subsequently request a higher amount of attorney’s fees than the amount
awarded by the jury.

At the conclusion of the trial
court’s reading of the jury verdict, the trial court asked the parties, “Motion
to accept the verdict?”  The Diazes’
counsel responded, “Yes, your honor, I make that motion.”  The trial court then stated, “Verdict
accepted,” and it discharged the jury. 
Mac Haik subsequently filed a motion for judgment notwithstanding the
verdict, and the Diazes filed a “motion to enter judgment.”  In their post-judgment motion, the Diazes asked
the trial court to (1) enter a judgment on the jury’s findings in response to
question numbers one, two, three, and five and to award them damages of
“restoration of $8,795.95, a sum which was subject to stipulation at trial, in
exchange for return of the Tahoe” and (2) disregard the jury’s findings on
attorney’s fees, contending that the evidence conclusively established $33,000
in attorney’s fees for trial, $6,000 in attorney’s fees for an appeal to the court
of appeals, and $6,000 in attorney’s fees for an appeal the supreme court.

In support of their argument that the
Diazes waived any right to ask the trial court to disregard the jury attorney’s
fees findings and award higher fees by “accept[ing] the verdict” and agreeing
to discharge the jury, Mac Haik and Wells Fargo cite case law indicating that a
party should include reservation of rights language in a motion for entry of
judgment if a party wants to challenge that judgment on appeal.  See
First Nat’l Bank of Beeville v. Fojtik, 775 S.W.2d 632, 633 (Tex. 1989) (stating
that “[t]here must be a method by which a party who desires to initiate the
appellate process may move the trial court to render judgment without being
bound by its terms” and a party should include a reservation of rights in any
such motion for entry of judgment approving reservation of rights language in
motion for entry of judgment); see also
Litton Indus. Prods., Inc. v. Gammage, 668 S.W.2d 319, 322 (Tex. 1984) (disapproving
“practice by which a party, by motion, induces the trial court on the one hand
to render a judgment, but reserves in a brief the right for the movant to
attack the judgment if the court grants the motion”); Casu v. Marathon Ref. Co., 896 S.W.2d 388, 389–90 (Tex. App.—Houston
[1st Dist.] 1995, writ denied) (stating that when party asks trial court to
render judgment for particular amount, and court renders such judgment, party
cannot challenge the judgment and “[t]o preserve the right to complain about a
judgment on appeal, a movant for judgment should state in its motion to enter
judgment that it agrees only with the form of the judgment, and note its
disagreement with the content and result of the judgment”).

None of the cases cited by Mac Haik and
Wells Fargo suggest that the Diazes’ agreement on the reporter’s record to
“accept” the verdict and discharge the jury barred the Diazes from subsequently
filing a motion asking the trial court to disregard certain jury findings based
upon sufficiency challenges.  See Tex.
R. Civ. P. 293 (providing that when jurors agree upon their verdict,
they shall deliver their verdict and “[i]f the verdict is in proper form, no
juror objects to its accuracy, no juror represented as agreeing thereto
dissents therefrom, and neither party requests a poll of the jury, the verdict
shall be entered upon the minutes of the court”); see also Thomas v. Oil & Gas Bldg., Inc., 582 S.W.2d 873, 881 (Tex.
Civ. App.—Corpus Christi 1979, writ ref’d n.r.e.) (holding that trial court
properly received verdict and that plaintiff did not, by motion to accept
verdict, waive right to attack the jury’s findings on grounds that findings
were against overwhelming weight and preponderance of evidence).  Accordingly, we hold that the Diazes, by
accepting the verdict and agreeing to the discharge of the jury, did not waive
their right to subsequently timely file a motion to disregard the jury findings
on attorney’s fees on the ground that the evidence conclusively established a
higher amount of attorney’s fees.[17]

We overrule Mac Haik and Wells Fargo’s
sixth issue. 

Judgment Against Wells Fargo

In their seventh issue, Mac Haik and
Wells Fargo argue that the Diazes “waived all claims they might have asserted
against Wells Fargo” because they failed “to submit any issues to the jury
concerning Wells Fargo” and “[t]here was no testimony or evidence proving that
Wells Fargo would be liable as a holder of the contract.”   In response, the Diazes contend that “[t]here
was no need . . . to submit any jury issues relating to Wells Fargo because its
liability was entirely derivative of Mac Haik’s liability.”  The Diazes also contend that in seeking
relief against Wells Fargo, they “relied entirely upon a clause in the retail
installment contract” that was admitted into evidence and there was “undisputed
evidence at trial” that the Diazes made payments to Wells Fargo “indicating”
that Wells Fargo “was the holder of the contract.”

In their petition, the Diazes alleged
that Wells Fargo was “responsible for these claims as well because of the
clause in the contract which provide[d] that the holder of the contract is
subject to all claims and defenses that the buyer has against the seller.”  The Diazes alleged that this “holder” clause
“allow[ed] the Diazes to seek affirmative relief” against Wells Fargo.  

At oral argument, the parties stated
that although no issues were submitted to the jury concerning Wells Fargo’s
liability, Wells Fargo appeared and was represented by counsel at trial.   The trial court entered judgment against Mac
Haik and Wells Fargo on May 15, 2009.  Mac
Haik timely filed a new-trial motion, but raised no complaint in this timely
new-trial motion concerning the judgment against Wells Fargo. Wells Fargo did
not timely file a new-trial motion, and Wells Fargo did not attack, in any other
timely post-judgment motion, the legal basis on which the trial court entered
judgment against it.[18]   Thus, Wells Fargo failed to preserve the
challenge it now seeks to present on appeal. 


We overrule Mac Haik and Wells Fargo’s
seventh issue.

Conclusion

          We
affirm the judgment of the trial court.  

 

 

                                                          Terry
Jennings

                                                                   Justice


 

Panel consists of Justices
Jennings, Alcala, and Sharp.











[1]           As explained below, the Diazes named
Wells Fargo as a defendant in their petition, but no jury questions were
submitted in regard to Wells Fargo. 
Nevertheless, the trial court rendered judgment against Mac Haik and Wells
Fargo jointly, and Wells Fargo is a party to this appeal.

 





[2]           See
Tex. Bus. & Com. Code Ann. §§
17.41–.63 (Vernon 2002 & Supp. 2010).

 





[3]           It
is undisputed that the Diazes nonsuited their claims against Mac Haik
Chevrolet GP LLC (“Mac Haik GP”) prior to trial.

 





[4]           This
box, which was not signed by the Diazes, provided,

 

DISLCAIMER
OF WARRANTIES

 

The Seller Hereby Expressly Disclaims All
Warranties, either Express or Implied, Including Any Implied Warranty of
Merchantability of Fitness For A Particular Purpose, and Dealership Neither
Assumes Nor Authorizes Any Other Person To Assume For It Any Liability In
Connection With This Sale.

 

Buyer’s Signature ________________ 

 





[5]           These documents are missing from the
record before us. However, the substance of these documents was discussed on
the record.





[6]           See Tex.
Bus. & Com. Code Ann. § 17.46(a) (Vernon Supp. 2010).

 





[7]           See id. § 17.50(b)(3) (Vernon Supp. 2010).





[8]           See Tex. Bus. & Com. Code Ann.
§ 2.711 (Vernon Supp. 2010).

 





[9]           Question four, the damages question,
did not call for a yes or no answer, but we interpret this question as
permitting the award of attorney’s fees based upon an affirmative finding to
any of the predicate questions.

 





[10]         Neither party complains about the jury
charge on appeal.





[11]         We
construe Mac Haik and Wells Fargo’s first three issues as presenting legal- and
factual-sufficiency challenges to both the jury’s DTPA findings and the jury’s
breach of express warranty findings.  Mac
Haik and Wells Fargo’s first three issues primarily focus on the jury’s DTPA
findings, and, because there is no direct challenge to the jury’s finding in
response to question three on the breach of warranty finding, it is arguable as
to whether Mac Haik and Wells Fargo have adequately briefed any challenge to
this finding.  We note that if an
independent ground fully supports the complained-of judgment, but an appellant
assigns no error to that independent ground, then we must accept the validity
of the unchallenged independent ground and, thus, any error in another ground
challenged on appeal is harmless.  Britton v. Tex. Dep’t of Crim. Justice,
95 S.W.3d 676, 682 (Tex. App.—Houston [1st Dist.] 2002, no pet.); Harris v. Gen. Motors Corp., 924 S.W.2d
187, 188 (Tex. App.—San Antonio 1996, writ denied). The rule requiring
an appellant to attack all independent grounds supporting a judgment has been
applied in many contexts, including independent jury findings fully supporting
a trial court’s judgment.  See Britton, 95 S.W.3d at 682 (stating
that “appellant must attack each independent jury finding to obtain a
reversal”).  Because we have construed
Mac Haik and Wells Fargo’s briefing to include a challenge to the warranty
finding, we do not apply this law in this case and will consider the merits of
Mac Haik and Wells Fargo’s sufficiency challenges.  However, we also note that Mac Haik and Wells
Fargo argued their legal- and factual-sufficiency challenges separately. 





[12]         Mac
Haik and Wells Fargo’s sufficiency arguments ignore the proper standard of
review, the actual evidence presented by the Diazes, and the reasonable
inferences that could have been drawn from that evidence.  At trial, by taking the position that the
switch did not exist on the Tahoe at the time of purchase, Mac Haik and Wells
Fargo necessarily asked the jury to believe one of two possible factual
theories. First, that the Diazes, shortly after they had purchased their Tahoe,
installed the switch and, within months, returned to Mac Haik to complain about
the switch.  Second, that some third
party obtained access to the Diazes’ Tahoe and, unbeknownst to the
Diazes, installed the switch.  It is
clear that the jury rejected these theories, and instead necessarily concluded
that the switch was on the Tahoe at the time of the Diazes’ purchase.

 





[13]         As noted above, Wells Fargo was not
identified in the jury charge.  We
separately discuss the judgment entered against Wells Fargo below.





[14]         “[A]
party may assert on appeal that unreliable scientific evidence or expert
testimony is not only inadmissible, but also that its unreliability makes it
legally insufficient to support a verdict.” 
Whirlpool Corp. v. Camacho,
298 S.W.3d 631, 637 (Tex. 2009).  Here,
Mac Haik has argued that the trial court abused its discretion in admitting Eppes’s
testimony.





[15]         In their appellees’ brief, the Diazes
argue this preservation issue, asserting that at no point in the trial court
did Mac Haik or Wells Fargo object to Eppes’s opinions that the switch
functioned to stop the odometer from recording mileage, the Tahoe drove as if
it had 80,000 to 90,000 miles on it, or the fair market value of the Tahoe was
$9,000.  In their reply brief, Mac Haik
and Wells Fargo do not expressly concede this point, but they do limit their
argument to those challenges that they raised in their motion to exclude. Mac
Haik and Wells Fargo also do not cite to any other place in the record where
they presented objections to Eppes’s testimony. 
We also note that Eppes’s testimony concerning the function of the
switch seems unremarkable since the function of the switch never appeared to be
seriously in dispute and Eppes’s testimony was merely cumulative of the other
evidence regarding the function of the switch. 


 





[16]         In their reply brief, Mac Haik and Wells
Fargo reference the third category, but they do not cite to any objectionable
testimony in the record.   





[17]         Mac Haik and Wells Fargo do not
challenge the sufficiency of the evidence to support the judgment awarding the
Diazes attorney’s fees.





[18]         Although not stated in the judgment, the
only basis for liability against Wells Fargo pleaded by the Diazes was
derivative liability arising from the retail installment contract.  After argument, the Diazes filed a
post-submission brief, again explaining that the trial court had found Wells
Fargo derivatively liable as the lender under this contract.  We need not directly comment on this legal
matter because Wells Fargo never timely presented its complaint to the trial
court.  Wells Fargo does argue that its
new-trial motion, which was filed more than thirty days after judgment, was
timely.  Wells Fargo is incorrect.  See
Tex. R. Civ. P. 329b (providing
that motion for new trial must be filed within thirty days from date judgment
is signed).